IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| TANYA NICOLS, | CASE NO. 3:26-cv-151 |
| Plaintiff, | DISTRICT JUDGE JEFFREY J. HELMICK |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Tanya Nicols filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. For the reasons stated below, I recommend that the District Court reverse the Commissioner's decision.

**Procedural history**

In April 2022,[1] Nicols protectively filed an application for disability

---

[1] An application is deemed protectively filed when the Agency finds that the claimant sufficiently communicated with the Agency prior to the submission of an official application so that the claimant receives the benefit of an earlier application date. *See* 20 C.F.R. § 416.340. Here, the ALJ found that Nicols had a protective filing date of April 2022. Tr. 17.

insurance benefits alleging a disability onset date of April 8, 2022,[2] and claiming she was disabled due to fibromyalgia, systemic lupus, and tachycardia. Tr. 178, 212. The Social Security Administration denied Nicols's application and her motion for reconsideration. Tr. 105, 116. Nicols then requested a hearing before an Administrative Law Judge (ALJ). Tr. 128.

In July 2024, an ALJ held a hearing, during which Nicols and a vocational expert testified. Tr. 40–88. Shortly thereafter, Nicols filed an application for supplemental security income, which was consolidated with her disability insurance benefits claim. Tr. 17. In December 2024, the ALJ issued a written decision finding that Nicols was not disabled. Tr. 17–35. The ALJ's decision became final on November 20, 2025, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Nicols filed this action on January 20, 2026. Doc. 1. She asserts the following assignments of error:

> 1. Whether the ALJ erred by concluding that Nicols' lupus did not meet the criteria of Listing 14.02 without providing an adequate explanation or analysis to support that conclusion.
>
> 2. Whether the ALJ properly considered Nicols' subjective complaints in light of her fibromyalgia diagnosis.

Doc. 8, at 1.

---

[2]  "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

**Evidence**

*Personal and vocational evidence*

Nicols was 42 years old on her disability onset date. Tr. 33. She completed eleventh grade and used to work cleaning houses. Tr. 213.

*Relevant medical evidence*

In January 2020, Nicols followed up with Jessica Hofstetter in a rheumatology department for "a mild form" of systemic lupus erythematosus (SLE) and fibromyalgia. Tr. 316, 319. She reported extreme anxiety that began after she started a medication. Tr. 320. Nicols also reported constant full-body joint pain and nerve pain in her legs. Tr. 320. On exam, Nicols had positive tender points in her suboccipital muscles, lower cervical spine levels, lateral epicondyle, greater trochanters, and left medial knee. Tr. 320. She had normal muscle tone and strength, no edema, and a normal gait. Tr. 320. Nicols's psychiatric findings were normal: good insight and good judgement; normal mood and affect; active, alert, and orientated behavior; and normal recent and remote memory. Tr. 320. Nicols had thrush on her gums. Tr. 320. Dr. Hofstetter diagnosed Nicols with fibromyalgia "manifesting as leg pain, hip pain, and arm pain." Tr. 320. Dr. Hofstetter also cited poor sleep, anxiety, and depression. Tr. 320. Dr. Hofstetter diagnosed systemic lupus erythematosus "with recent joint swelling which improve[d] some with prednisone." Tr. 321. She issued Nicols a temporary handicap placard due to lupus. Tr. 321.

In April 2020, Nicols followed up with Dr. Hofstetter by video and

reported no significant change in her pain. Tr. 314. Nicols reported continued swelling in her hands. Tr. 314. Dr. Hofstetter increased Nicols's methotrexate dosage and continued prednisone. Tr. 315.

In July 2020, Nicols returned to rheumatology with complaints of foot pain and swelling and saw Erica Benvenutti, MD. Tr. 301. Nicols said that the methotrexate "was no longer helping." Tr. 304. Her exam findings were the same as her January visit, except that she had "[t]race soft tissue swelling over" her ankle bones, and bruising in this area which Dr. Benvenutti attributed to prednisone use. Tr. 304–05. Nicols also had widespread hyperalgesia—abnormal sensitivity to pain—in her muscles and joints "above and below the waist." Tr. 305. Dr. Benvenutti adjusted Nicols's medications. Tr. 305.

In May 2022, Nicols saw Mohamed Altattan, MD, for a rheumatology appointment. Tr. 428. Nicols reported muscle aches and weakness, joint pain, extremity swelling, fatigue, and sleep disturbance. Tr. 431. Nicols's exam findings were the same as her previous visit, except that her trace ankle edema had resolved. Tr. 431. Dr. Altattan adjusted Nicols's medications. Tr. 432.

In November 2022, Nicols followed up with Dr. Altattan for joint pain and swelling. Tr. 418. Nicols also reported fatigue and muscle pain. Tr. 418–19. She denied gait problems. Tr. 419. Nicols's musculoskeletal exam showed no swelling or tenderness, normal range of motion, and no active synovitis in any joint. Tr. 419. Nicols's skin exam showed widespread hyperalgesia and

4

diffuse tender points. Tr. 419. Nicols's psychiatry exam was normal. Tr. 419–20.

On March 17, 2023, Nicols followed up with Dr. Altattan. Tr. 424. She reported burning leg pain; swelling in her hands, feet, and elbows; periodic shortness of breath; and numbness and tingling in her fingers and toes. Tr. 426. On exam, she had 18 out of 18 positive tender points and edema in her ankles, wrists, elbows, fingers, and toes. Tr. 426. Dr. Altattan increased Nicols's Gabapentin dosage and continued her other medications. Tr. 427.

On March 22, Nicols went to the emergency department for a migrating facial rash that she believed was foot-and-mouth disease. Tr. 662. She also reported mouth sores and a hand rash. Tr. 662. Nicols was worried that her lupus was affecting her brain, because she had been confused and forgetful and exhibited rapid speech. Tr. 662. On exam, Nicols had tenderness and swelling under her right eye, canker sores, and angular cheilitis (inflammation in the corners of her lips). Tr. 664. A CT scan of Nicols's brain showed sinusitis and was otherwise normal. Tr. 665. Nicols was diagnosed with a blocked tear duct and lupus. Tr. 665–66.

On March 29, 2023, Nicols saw Nurse Practitioner Angela Wong for a consultative exam. Tr. 445. Nicols said that her fibromyalgia caused sharp pain and weakness all over her body. Tr. 445. About four times a week she experienced joint swelling in her hands, feet, and knees. Tr. 445. Nicols also reported balance issues, nausea, occasional vomiting, lethargy,

lightheadedness, and problems sleeping. Tr. 445. Her medication helped her symptoms. Tr. 445. Nicols said that she injured her left knee in a fall the year before the exam. Tr. 445. Nicols also said that she had lupus, which caused joint pain that migrated from joint to joint; hair loss; teeth loss; and a scabby scalp. Tr. 445–46. Nicols said that she took prednisone and another medication for lupus and that it helped her symptoms. Tr. 446. She reported lupus flare-ups twice per month lasting five to seven days. Tr. 446. Finally, Nicols said that she had experienced neck pain for ten years, Tr. 446, and that she has tachycardia, which caused dizziness and numbness in her hands and feet, Tr. 447.

On exam, Nicols exhibited a normal gait and stance and could heel-toe walk with difficulty. Tr. 448. She had difficulty performing a tandem walk and mild difficulty performing a full squat. Tr. 448. Dr. Wang remarked that Nicols didn't need help changing for the exam or getting on and off the exam table and she could rise from a chair without difficulty. Tr. 448. Nicols had tenderness in her right knee but no redness, heat, or effusion. Tr. 449. She had positive fibromyalgia trigger points. Tr. 449. Wang concluded that Nicols had "moderate limitation[s] in walking, standing, lifting, carrying, climbing, reaching, pushing, and pulling." Tr. 449.

In June 2023, Dr. Nezam Altorok, from the rheumatology department, completed a disability-report form on Nicols's behalf. Tr. 547. Dr. Altrorok wrote that Nicols had very severe fibromyalgia, which affected her ability to

6

perform basic daily activities. Tr. 547.

In early August 2023, Nicols re-established care with Harbor Behavioral Health for help applying for disability benefits after being diagnosed with lupus. Tr. 568. Nicols reported severe anxiety that at times made it hard for her to breathe and she felt like she was having a heart attack. Tr. 568. She said that most days she didn't want to get out of bed or interact with others. Tr. 568. On exam, Nicols had a normal gait, regular speech, and good eye contact, grooming, and hygiene. Tr. 569. She had an anxious and expansive mood and a broad affect. Tr. 569. Nicols had a logical thought process, an intact memory and recall, and good insight and judgment. Tr. 569. Nicols reported additional symptoms including weight loss, lack of appetite, and complications from steroid treatment. Tr. 575.

Later that month, Nicols had a counseling session. Tr. 582. She "discussed the stressors in her life regarding trying to help her sister in law with organizing her closet." Tr. 582. Nicols said that she experiences swelling in all of her joints, which requires her to rest for 90 percent of the day. Tr. 582.

On October 11, 2023, Nicols saw Physician Assistant Michelle Bassiouni for a psychological consultative exam. Tr. 561–65. On exam, Nicols showed no problems with behavior, thought content or process, speech, mood, affect, perception, orientation, attention, concentration, or memory. Tr. 562–64. Bassiouni observed that while Nicols said "that she can barely walk," she walked "with a normal gait in and out of the office to her car." Tr. 565.

7

Bassiouni opined that Nicols can follow simple and complex instructions; sustain attention in a competitive work environment; work well with others; get along with the public; and can tolerate stress associated with work activity. Tr. 565. She wrote that Nicols did not appear to be in pain during the interview and "may be exaggerating her symptoms." Tr. 565. She did not "appear to be a reliable historian." Tr. 561.

Twelve days later, Nicols had a remote counseling session and said that she had been sick with a cold for over a week and was "experiencing flare ups." Tr. 625. She was unable to rest because she was dog sitting for a family member. Tr. 625.

In November 2023, Nicols saw Dr. Altorok and Samantha Davis, MD, at the rheumatology department for a follow-up. Tr. 1028. Nicols reported "persistent pain limiting her daily activities and work." Tr. 1028. She also reported blurry vision, and, periodically, shortness of breath and numbness and tingling in her hands and feet. Tr. 1029. Nicols said that she had swelling in her ankles, wrists, elbows, fingers, and toes, and severe burning pain in her legs. Tr. 1029. On exam, Nicols had 18 out of 18 tender points and edema in the above-listed joints. Tr. 1029–30. She was also very anxious. Tr. 1030. The doctors commented that Nicols's last eye exam "was some time ago and she is due" for another. Tr. 1028. They wrote that Nicols "has severe fibromyalgia and SLE with significant weakness in the arms and legs. She can not work as

8

these symptoms are causing significant limitation of daily activities." Tr. 1032 (emphasis removed).

On April 1, 2024, Nicols went to the emergency room after she exhibited signs at home of a seizure, including confusion, and was admitted to the hospital. Tr. 729. Nicols said that she had lost 22.7 percent of her body weight "over the past few months due to 'being sick.'" Tr. 763. She was discharged the next day and advised to follow up with neurology and psychiatry. Tr. 781–82.

On April 11, Nicols followed up with a neurologist. Tr. 723. The doctor reviewed Nicols's brain-related diagnostic tests that had been run at the hospital, which were unremarkable. Tr. 724. The provider commented that Nicols had "discontinued multiple medications at once without instruction from a physician," Tr. 723, and indicated a diagnosis of possible benzodiazepine withdrawal as the cause of her recent symptoms, Tr. 727.

In late May 2024, Nicols followed up with rheumatology and saw Dr. Altorok and Nathaniel Gilbert, MD. Tr. 1056. Nicols again reported blurry vision; periodic shortness of breath and numbness and tingling in her hands and feet; swelling in her ankles, wrists, elbows, fingers, and toes; and severe burning pain in her legs. Tr. 1057. On exam, she had 18 out of 18 tender points and edema in the joints listed above. Tr. 1058. She was very anxious. Tr. 1058. Nicols told the doctors that her lupus was worse, but the doctors disagreed, commenting that this was "not the case." Tr. 1058.

*Hearing testimony*

Nicols, who was not represented by counsel, testified at the administrative hearing. She stated that, on a day with no fibromyalgia flare-up, she could only stand for "a couple minutes" before her legs gave out or started to shake and burn. Tr. 62. Nicols said that she was "stuck in bed" for about "two weeks a month." Tr. 62, 63–64.

The ALJ discussed with the vocational expert Nicols's past relevant work as a dayworker. Tr. 74. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Nicols could perform Nicols's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 76–78. The vocational expert answered that such an individual could not perform Nicols's past work but could perform the following jobs—store cashier, merchandise marker, and routing clerk. Tr. 76–78.

**The ALJ's decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.
>
> 2. The claimant has not engaged in substantial gainful activity since April 8, 2022, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).
>
> 3. The claimant has the following severe impairments: degenerative disc disease of the cervical spine; lupus; fibromyalgia; postural orthostatic tachycardia syndrome (POTS); major

10

depressive disorder; and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity[3] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can never climb ladders, ropes or scaffolds, balance, as that term is used vocationally, kneel, crouch, or crawl. The claimant must avoid all exposure to dangerous moving machinery and unprotected heights. The work must be able to be learned in 30 days, or less, with simple routine tasks, simple work-related decisions, and routine workplace changes. No production rate pace work, such as on an assembly line or work with hourly productively goals.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was … 42 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20

---

[3] A residual functional capacity (RFC) is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 8, 2022, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 20–35.

### Legal Standard

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.  Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.  Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

12

3.   Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.   What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.   Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."

*Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Nicols argues that the ALJ "erred by concluding that Nicols'[s] lupus did not meet the criteria of Listing 14.02(A)[4] without providing an adequate explanation or analysis to support that conclusion." Doc. 8, at 7. She complains that the ALJ "offer[ed] only a conclusory recitation of the listing criteria without comparing any of the listing criteria to the record evidence," and asserts that the ALJ must do more—the ALJ "must "actually evaluate the evidence, compare it to the requirements of the listing, and give an explained conclusion." *Id.* (citing *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011)).

At step three of the disability evaluation process, a claimant will be found disabled if his or her impairments meet or equal one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that any condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which

---

[4] The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each body system section has an Introduction, which contains information relevant to that system, and a Category of Impairments, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id.*; 20 C.F.R. § 404.1525.

describes how the impairment has such equivalency." *Id*. at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to 'meet' the listing." *Reynolds*, 424 F. App'x at 414. "[A] claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]" *Id*. There is no heightened articulation standard at step three. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

In *Reynolds*, the case that Nicols relies on, the ALJ found at step two that the claimant had a severe mental impairment and a severe physical impairment of "back pain." 424 F. App'x at 415. At step three, the ALJ stated that Reynolds did not "meet sections 1.00 or 12.00," which respectively cover musculoskeletal and psychological listings. *Id*. The ALJ then "conducted a thorough … full-page assessment" of Reynold's mental impairment under Listing 12.04, but provided "no analysis whatsoever" regarding Reynold's back pain. *Id*. The Court concluded that by failing to discuss Reynold's back impairment at step three, the ALJ "skipped an entire step of the necessary analysis. He was required to assess whether Reynolds met or equaled a Listed Impairment (such as [Listing 1.04, *Disorders of the spine*]), but did not do so." *Id*. at 416.

Here, at step three, the ALJ considered listings 1.15 (disorders of the skeletal spine), 1.16 (lumbar spinal stenosis), 14.09D (inflammatory arthritis

16

for fibromyalgia), 4.05 (arrhythmias), 14.02 (systemic lupus erythematosus), 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders). Tr. 22–23. Regarding Listing 14.02, the ALJ wrote:

> Listing 14.02 requires systemic lupus erythematosus with A or B. Part A requires involvement of two or more organs/body systems, with one of the organs/body systems involved to at least a moderate level of severity; and at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss). Part B requires repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level: limitation of activities of daily living, limitation in maintaining social functioning, or limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. However, the evidence failed to show the claimant satisfied the requirements of A or B. Accordingly, the claimant's impairments do not meet listing 14.02 (3F/6).

Tr. 23. This discussion is not like the ALJ's discussion in *Reynolds* because here, unlike in *Reynolds*, the ALJ identified the precise listing she considered, stated the requirements, and concluded that Nicols did not satisfy them. Tr. 23; *see Reynolds*, 424 F. App'x at 416 (reversing because the ALJ "was required to assess whether Reynolds met or equaled a Listed Impairment (such as [Listing 1.04, *Disorders of the spine*]), but did not do so.").

Moreover, in *Bledsoe*, the Sixth Circuit rejected the claimant's argument that the ALJ "should spell out the weight he gave to each factor in his step

17

three analysis." 165 F. App'x at 411. The Court stated that there is no "heightened articulation standard" at step three "where the ALJ's findings are supported by substantial evidence [discussed elsewhere in the ALJ's decision]." *Id.* The Court relied on the ALJ's five-page, step-two discussion of Bledsoe's severe and non-severe impairments to find support for the ALJ's step-three finding, and commented that the ALJ didn't need to "spell out every fact a second time under the step three analysis." *Id.* So this Court must consider the remainer of the ALJ's decision to determine whether it provides support for the ALJ's step three finding. *See id.*

Both parties quote cases that discuss a different standard—the "substantial question" standard. Doc. 8, at 7 (Nicols's brief citing *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432–33 (6th Cir. 2014)); Doc. 10, at 6 (Commissioner's brief citing *Pasiak v. Comm'r of Soc. Sec.*, 800 F. App'x 301 (6th Cir. 2019)). But the *substantial question* standard applies to cases in which the ALJ doesn't evaluate a particular listing at all. *See Smith-Johnson,* 579 F. App'x at 432 (citing *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013)); *Pasiak,* 800 F. App'x at 304 (citing *Sheeks,* 544 F. App'x at 641). In such cases, it makes sense that to rise to a level of reversible error, the claimant must show that there is a *substantial question* as to whether she satisfies the listing she believes the ALJ should have considered. But here, the ALJ considered the appropriate listing. Tr. 23. So the Court must review the ALJ's decision as a whole to determine whether, elsewhere in the decision, the

ALJ made findings to support her step three determination.[5] *See Bledsoe*, 165

F. App'x at 411. As explained below, the ALJ did not do so.

Listing 14.02, *systemic lupus erythematosus*, requires:

> A. Involvement of two or more organs/body systems, with:
>
> > 1. One of the organs/body systems involved to at least a moderate level of severity; and
> >
> > 2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 14.02A.[6]

> Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ("lupus fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis).

*Id.* at Listing 14.00D(1)(a).

The Commissioner asserts that the ALJ found that Nicols's lupus was

mild. Doc. 10, at 6. This is true—as the ALJ observed:

---

[5]     Even if the *substantial question* standard applied, Nicols has shown that she would meet it.

[6]     Nicols has not challenged the ALJ's finding that she doesn't satisfy Listing 14.02B.

> [i]n November 2023, after negative testing results, [Nicols] was considered to have mild lupus, (21F/12), in March 2024 while she was upset her lupus was 'worse', her treating source noted this was "not the case", (21F/39).

Tr. 27; Tr. 1058. But Listing 14.02A describes discrete elements. And elsewhere in the decision, the ALJ didn't explain findings to support her conclusion as to these elements.

For example, as Nicols points out, she had the involvement of multiple "organ or body systems" that Listing 14.02A requires. Doc. 8, at 8–10. Indeed, the ALJ at step two assessed Nicols's POTS and mental impairments as "severe" impairments.[7] Tr. 20. The ALJ sufficiently explained why Nicols's POTS didn't rise to a *moderate* level of severity when she wrote that Nicols's cardiology exams were more often than not normal; Nicols "more frequently" denied symptoms; and Nicols didn't seek treatment from a cardiologist. Tr. 30. But when evaluating Nicols's mental impairments, the ALJ found that Nicols had a "moderate" limitation in two out of the four areas of functioning. Tr. 23–24. It's not clear whether one of these *moderate* findings would suffice under Listing 14.02A(1), or if the ALJ would have considered Nicols's mental impairments, as a whole, to rise to a moderate level as that term is used in

---

[7] This is not to say that the ALJ found that these impairments caused severe limitations—only that the ALJ recognized for step-two purposes that the impairments caused more than "a slight abnormality that minimally affects work ability." *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, n.2 (6th Cir. 2007) (defining non-severe impairments) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)).

Listing 14.02A(1). The ALJ didn't say, and the remainder of her decision doesn't indicate an answer to this question.[8]

Nicols also asserts that her "musculoskeletal and/or immunological systems are both extensively involved throughout the record." Doc. 8, at 8. Nicols regularly visited the rheumatology department for her fibromyalgia and lupus, and was at times found to have joint swelling and 18 out of 18 trigger point findings. *See, e.g.*, Tr. 426 (March 2023), Tr. 1029–30 (November 2023); Tr. 1058 (May 2024). While the ALJ's decision sufficiently supports a finding that Nicols's musculoskeletal system was either not involved or not at least moderately severe, *see* Listing 14.02A(1), Tr. 28, the same cannot be said for the ALJ's decision regarding Nicols's immunological system. The only comment that the ALJ made regarding Nicols's immunologically induced joint edema was that "no intervention was offered for her complaints of edema or the burning sensation [in her legs]." Tr. 27. This observation doesn't explain why Nicols's immunological symptoms failed to satisfy the criteria in Listing 14.02A(1).[9]

---

[8]   Moreover, when evaluating Nicols's mental impairments later in the decision, the ALJ appeared to have misconstrued a counseling note from August 2023. Tr. 31 (citing "20F/22-25, 36," an August 2023 treatment note). The ALJ's recitation of some of the information in this note was not from August 2023, but from Nicols's prior visit in 2015, which the note reproduces. *See* Tr. 947, 949.

[9]   Nicols was also assessed with widespread hyperalgesia, *see, e.g.*, Tr. 305, which at times was assessed on exam as a "skin" finding, *see* Tr. 419. And *skin* is an organ contemplated by Listing 14.02A. *See* 20 C.F.R. § Pt. 404, Subpt. P,

As for Listing 14.02A(2)'s criteria—at least two "constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)"—the parties dispute whether Nicols reported "severe fatigue" rather than plain "fatigue." Doc. 8, at 8; Doc. 10, at 6. The Commissioner analyzes medical records himself and tallies up Nicols's weight to show that it remained "stable" through 2024, and that Nicols's allegations of involuntary weight loss, Doc. 8, at 10–11 (citing various transcript pages with allegations and objective weight reports), Doc. 11, at 3, were just that—allegations. Doc. 10, at 7. Nicols says that she reported malaise in the form of "feeling 'sick' for weeks" and in fact canceled doctor appointments as a result, Doc. 8, at 11 (citing Tr. 625, 763, 803, 806, 808), while the Commissioner again retorts that the ALJ noted that Nicols's providers said that her mild lupus hadn't worsened, Doc. 10, at 7 (citing Tr. 28).

These arguments are for the ALJ to decide. The Court is not medically trained, and it is the ALJ's job to explain the findings in her decision. The ALJ did not adequately do so at step three, and the Court is unable to piece together bits in the remainder of the ALJ's decision to complete the picture.

Moreover, the ALJ in part misconstrued the evidence when she evaluated Nicols's allegations of symptoms and limitations, which makes it harder to find explanations elsewhere in the decision to support the ALJ's step

---

App. 1, Listing 14.00D(1)(a). It's not clear whether this condition was caused by Nicols's fibromyalgia or lupus—that is for the ALJ to determine.

22

three finding. The ALJ wrote that Nicols "reported to a mental health provider in August 2023 [that] she avoided being home, which is inconsistent with her statements [that] she did not often leave home and spent most days in bed (19F/4)." Tr. 30 (citing Tr. 867). But as Nicols points out, the reference to avoiding home was a re-printed summary of Nicols's statements from 2015—not her statements in August 2023, in which she did indeed report not wanting to get out of bed most days.[10] *See* Doc. 8, at 13 (citing Tr. 937).

On remand, the ALJ will have an opportunity to re-evaluate Nicols's allegations of symptoms and limitations and provide further explanation at step three.[11]

---

[10]    To be fair, the treatment note is confusing because it lacks a clear demarcation between the old and new information. Tr. 867. In fact, Nicols makes this same mistake in her brief when describing a rheumatology record. *See* Doc. 8 at 3 (citing an April 2020 treatment note, Tr. 315, but reciting Nicols's reports that were copied from her previous visit in January 2020, Tr. 319).

[11]    Nicols also argues that the ALJ erred when she evaluated Nicols's allegations that stemmed from her severe fibromyalgia. Doc. 8, at 13. This is in part based on the ALJ's mischaracterization of the August 2023 treatment note, but is also in part based on the ALJ's reliance on objective exam findings to discount Nicols's fibromyalgia symptoms. Doc. 8, at 14–15 (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007) ("unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs.")). On remand, the ALJ will have an opportunity to re-evaluate Nicols's allegations of symptoms bearing in mind the caution regarding objective exam findings for fibromyalgia.

23

**Conclusion**

For the reasons explained above, I recommend that the Court reverse the Commissioner's decision and remand for proceedings consistent with this report.

Dated: August 11, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).